## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MARYLAND

| | |
|---|---|
| Jerri Joann Johnson,<br>        Plaintiff *Pro Se* | **Complaint for Race and Gender Discrimination**<br>**and Retaliatory/Wrongful Termination** |
| v. | Case N. **DKC 21CV2468** |
| O'Connell & Lawrence, Inc.,<br>        *Defendant.* | Jury Trial Requested |
| | Concurrent Jurisdiction with Maryland |

## PLAINTIFF *PRO SE*'S RESPONSE TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff *Pro Se* submits this response to the Defendant's Summary Judgment request, as she can provide factually supported evidence to prove that there does in fact exist a genuine issue as to the material facts, and as a matter of law, she is entitled to judgment. According to Title VII of the Civil Rights Act of 1964, Plaintiff *Pro Se* as a Black Female, belongs to a protected class and was engaged in a protected activity when she was unlawfully discharged as the final act of continued discriminatory hostile, bias and disparate treatment at the hands of the Defendant.

The following facts will refute the Defendant's claim of events in their entirety by showing that Plaintiff *Pro Se* suffered an almost three (3) month long campaign of cumulative hostile, bias and disparate treatment at the hands of the Defendant which ended in her wrongful retaliatory termination. Plaintiff *Pro Se* believes that the Defendant denied her the same employment benefits and opportunities that they made available to other employees of different races and gender of an unprotected class.

After Plaintiff *Pro Se* repeatedly complained to her Supervisor, Vice President Joshua Rice and upper Management regarding the discriminatory behavior and hostile, bias and disparate treatment she was suffering, without an appropriate response, her mental health began to languish so severely that she was eventually diagnosed with PTSD and is currently undergoing psychological treatment because of it. *(See Exhibit 1)*

The facts coupled with the evidence below will prove that the Defendant is attempting to confuse this Court by misconstruing the dates and misrepresenting the facts as the Defendant has stated that the decision to wrongfully terminate Plaintiff *Pro Se* was based on her work performance on the I-20 Expert Witness Report, a report which Plaintiff *Pro Se* had little involvement in solely because of her start date and the date the final draft of the report was due to their Client. *(See Exhibit 4; Page 12 AND Exhibit 15 AND Exhibit 7; Page 2 No. 10, 13 & 14)*

## THE FACTS

1.  On September 16, 2020, Plaintiff *Pro Se* began her employment with the Defendant. *(See Exhibit 2)*

2.  Plaintiff *Pro Se* was hired without an interview. *(See Exhibit 3; No. 10)*

> **INTERROGATORY NO. 10.**     Has the Plaintiff Pro Se ever been interviewed by the Defendant or any of their agents, assignees, employees or otherwise, and when, where and what individuals were involved in this interview, and were there interview notes, and what information in Plaintiff Pro Se's resume prompted the Defendant to hire Plaintiff Pro Se?
> **OCL ANSWER TO INTERROGATORY NO. 10.**     No interview was conducted prior to Defendant hiring Plaintiff. Robert Nash and/or Stan Martin may have informally met with Plaintiff prior to her performing work as an employee of her husband's company, Michael Dobson Contracting Corp., which had been previously retained by Defendant. Plaintiff was offered employment based upon her education and prior experience. *(See Exhibit 9)*

3.  The "prior experience" the Defendant is referencing was obtained when Plaintiff *Pro Se*

    worked for a consultant of the Defendant's, Michael Dobson Contracting Corp.

    performing Document Review for the Defendant. *(See Exhibit 4; Page 7 Footnote 5)*

4.  At this time the Defendant, in their "sole discretion" obviously believed Plaintiff *Pro Se*'s

    work performance was "satisfactory" as she received a $5.00 an hour rate increase

    after 8 weeks of work performance. *(See Exhibit 5; Service Fees)*

    > "Other Personnel from the Consultant will be paid on an hourly fee basis
    > at the provisional rate of Thirty-Five Dollars ($35.00) per hour, billable in
    > quarter-hour (0.25) increments. At the sole discretion and judgement of
    > the Company, if performance of Other Personnel is satisfactory, and after
    > 8 weeks, the provisional rate will be increased to Forty Dollars ($40.00)
    > per hour for the remainder of the agreement." *Id*

5.  Immediately, upon arrival at the Defendant's Baltimore office location the

    discriminatory events that make-up the culmination of hostile, bias and disparate

    treatment of Plaintiff *Pro Se* began.

6.  At the start of Plaintiff *Pro Se*'s employment with the Defendant, on September 16,

    2020, she was assigned to assist Rusty Erdman with drafting the I-20 Expert Witness

    Report. *(See Exhibit 4; Page 8 **AND** Exhibit 6 **AND** Exhibit 7; Page 2 No. 10)*

7.  On October 15, 2020, the final draft of the I-20 Expert Witness Project Report was

    submitted to the Client. *(See Exhibit 6 **AND** Exhibit 16)*

8.  To allow Plaintiff *Pro Se* to draft the I-20 Expert Witness Project Report after only one

    (1) month of employment with the Defendant, when they knew that she had no

    Technical Writing skill in the field of Engineering would be a Breach of Mr. O'Connell's

    Engineer's Professional Standard of Care as well as in opposition to Josh Rice's

statement regarding the obligation the Defendant has to their client to perform their job efficiently and well. *(See Exhibit 24)*

9.  The Defendant was in possession of Plaintiff *Pro Se*'s resume and knew that it did not state anything in reference to the skill of Technical Writing in the field of Engineering. *(See Exhibit 8)*

10. On November 19, 2020 Josh Rice, Plaintiff *Pro Se*'s Supervisor stated to her that she could not possibly comprehend the I-20 project material she was reading. *(See Exhibit 4; Page 9 **AND** Exhibit 10: Page 151 Lines 10-21, Page 152 Lines 1-21 & Page 153 Lines 1-10)*

<u>**Deposition Testimony of Jerri Johnson Pages 151 thru 153**</u>

| | |
|---|---|
| 10 | Did you have any communications with |
| 11 | Mr. Rice with regard to any other aspect of your |
| 12 | performance from the time you started -- you were |
| 13 | only there for a little over three months -- from |
| 14 | the time you started until the beginning of |
| 15 | December -- from the end of September to the |
| 16 | beginning of December, did you have any |
| 17 | communications with Mr. Rice about any other |
| 18 | aspect of your performance other than writing? |
| 19 | A    When I made my first race discrimination |
| 20 | complaint, race and gender discrimination |
| 21 | complaint, because he told Rusty that I did not |
| 1 | have the ability to comprehend what I was reading. |
| 2 | And I thought that was -- |
| 3 | Q    For some reason you thought that was |
| 4 | discriminatory? |
| 5 | A    Yes. |
| 6 | Q    Okay. |
| 7 | A    I couldn't comprehend -- |
| 8 | Q    Couldn't it just have been he didn't |
| 9 | think you got it, you didn't comprehend, you |
| 10 | didn't understand what you were doing? |
| 11 | A    But he hadn't even given me the option to |
| 12 | explain to him what it was that I got. |
| 13 | Q    Okay.  When was this? |

14    A      This was e-mails.      Rusty had me -- well,
15    I kind of took it upon myself because Rusty was --
16    Rusty was Rusty.      So I was sorting the e-mails by
17    subject and date and to and from on a particular
18    project.
19    And Josh was saying to Rusty that he
20    didn't believe I could comprehend what I was
21    reading in those e-mails.      But he never asked me
1     what I was taking from it.      He never asked me
2     about what I was comprehending.    He just assumed
3     that I didn't have the ability to comprehend what
4     I was reading.
5     Q      What does that have to do with your
6     gender or your race?
7     A      Why would you just assume that I can't
8     comprehend something?      If you think that I can't,
9     why don't you ask me, Jerri, you read such and
10    such; what was your take? *Id.*

11.    Also, on November 19, 2020, Plaintiff *Pro Se* was solely tasked with assisting Rusty

Erdman in preparing Ken O'Connell's I-20 project study binder.  *(See Exhibit 4; Page 8 &*

*9 **AND** Exhibit 7; Page 2 No. 10)*

12.    Ken O'Connell's I-20 project study binders consist of all of the project materials,

categorized, and organized by topic and/or subject and date, which he then utilizes to

prepare himself for the Expert Witness Testimony that he will give on the stand to

support his opinion in his I-20 Expert Witness Project Report.  *(See Exhibit 7; Page 2*

*No. 10)*

13.    This information is important because the study binders can only be produced after the

Expert Witness Report is completed, otherwise, the information contained in the study

binders would fail to support the opinion contained in the Expert Witness Report.  In

short, by their sheer purpose and nature, the study binders cannot come before the

completion of the actual Expert Witness Report.

14.     These facts make it more likely than not that the date of October 15, 2020 is in fact

        the actual date that the I-20 Expert Witness Report was submitted to Mr. O'Connell and

        or the Client, and not in "late November" as the Defendant states.  *(See Exhibit 6 AND*

        *Exhibit 7; Page 2 No. 13 AND Exhibit 4; Page 12)*

15.     On November 20, 2020, after experiencing multiple acts of discriminatory hostile, bias

        and disparate treatment, Plaintiff *Pro Se* made her first complaint of race and gender

        discrimination.  *(See Exhibit 11)*

16.     Plaintiff *Pro Se* effectuated this complaint by approaching her Supervisor Josh

        Rice in his office and nobody else was present at that time. *Id.*

17.     Mr. Rice, when approached asked for an example, and Plaintiff *Pro Se* provided him with

        the statement he made on November 19th, just the day before when he said that she

        could not possibly comprehend the I-20 project materials. *(See Exhibit 4; Page 9 AND*

        *Exhibit 10; Page 151 Lines 10-21, Page 152 Lines 1-21 & Page 153 Lines 1-10)*

18.     Mr. Rice then stated that it was his intention to convey to Plaintiff *Pro Se* that because

        she was such a new employee, and the fact that the I-20 project was quite complex, and

        one that the Defendant had been working on long before Plaintiff *Pro Se* began her

        employment, that he did not believe that she could grasp the material as yet, and would

        need more time to "get up to speed" on the project. *(See Exhibit 4; Page 9 AND Exhibit*

        *12; Page 1 No. 3)*

19.     The Defendant is attempting to confuse the Court again by misconstruing dates and

        misrepresenting facts by claiming that Plaintiff *Pro Se* was not objectively acting in a

        Title VII protected activity when she made her first complaint of discrimination on

November 20, 2020 because she did not believe it to be an actual discrimination

complaint.

20.    To do this, the Defendant is taking two distinctly separate incidents and attempting to

combine the facts of both of them into one incident.

21.    The first incident the Defendant is using to confuse this Court occurred on November 9,

2020 when Plaintiff *Pro Se* was summoned to Mr. Rice's office along with Rusty Erdman

regarding an incident that took place on November 6, 2020. *(See Exhibit 3; No. 6)*

> **INTERROGATORY NO. 6.**    Was there an investigation or any type of
> investigatory inquiry into Plaintiff Pro Se's first, verbal race and gender
> discrimination complaint to her immediate Supervisor, Vice President Joshua
> Rice, and what did that investigation entail, what individuals were involved in
> that investigation, when was that investigation, are there investigatory notes or
> something similar, and what was the ultimate outcome of that investigation?
> **OCL ANSWER TO INTERROGATORY NO. 6.**    Defendant assumes that "first verbal
> race and gender discrimination complaint" is meant to refer to the "complaint"
> made to Rusty Erdman and Josh Rice referenced on page 3-4, Section A, of
> Plaintiff's Complaint. Although Plaintiff made a complaint to Mr. Erdman and Mr.
> Rice in November 2020, when OCL attempted to investigate, Ms. Johnson denied
> that she had made a "discrimination" complaint which needed to be
> investigated. Pursuant to Fed. R. Civ. P. 34(e), Defendant will produce documents
> from which the Answer to this Interrogatory may be derived or ascertained. *Id.*

22.    On November 6, 2020, Plaintiff *Pro Se* exchanged text messages with another employee

of the Defendant's named Bob Nash regarding COVID.  These text messages were

discussed by the Plaintiff *Pro Se* with other employees of the Defendant's during a jovial

conversation in reference to Bob Nash and his fear of COVID.  Rusty Erdman was among

the employees present during this conversation regarding Bob Nash's fear of COVID and

the text messages Plaintiff *Pro Se* received from Bob Nash regarding COVID.  Rusty

Erdman had asked Plaintiff *Pro Se*, on November 8th, to forward him the text message

exchange between Bob Nash and Plaintiff *Pro Se*, which Plaintiff *Pro Se* did, because she

believed that he wanted them in furtherance of the jovial nature of the November 8th conversation. Plaintiff *Pro Se* never thought that Rusty Erdman would make an official company complaint regarding these text messages on her behalf.

23.   On November 10, 2020, Plaintiff *Pro Se* received an email from Cindy Schuerholz, the Defendant's Human Resource Director, asking Plaintiff *Pro Se* to come to the Defendant's Olney office location to meet with her and Stanley Martin to discuss the text message exchange between Plaintiff *Pro Se* and Bob Nash. Plaintiff *Pro Se* responded to that email by explaining that she would indeed come to the Olney office and meet with Ms. Schuerholz and Mr. Martin, but she did not believe there existed an issue that warranted an official intervention by the company's Human Resource Director and their In-House Counsel. With that, Ms. Schuerholz stated "OK - thanks. No need to come down". *(See Exhibit 14)*

24.   The second incident occurred on November 20, 2020 when Plaintiff *Pro Se* made her first official complaint of discrimination, she did so after numerous acts of hostile, bias and disparate treatment at the hands of Josh Rice and two (2) other employees. *(See Exhibit 11)*. When asked by Mr. Rice to provide an example, Plaintiff *Pro Se* used Mr. Rice's statement to her just the day before, that "she could not comprehend the I-20 project materials". Mr. Rice then stated that it was his intention to convey to Plaintiff *Pro Se* that because she was such a new employee, and the fact that the I-20 project was quite complex, and one that the Defendant had been working on long before Plaintiff *Pro Se* began her employment, that he did not believe that she could grasp the

material as yet, and would need more time to "get up to speed" on the project. *(See Exhibit 4; Page 9 **AND** Exhibit 12; Page 1 No. 3)*

25.     As stated above, in Numbers 22 and 23, the November 9, 2020 event was totally separate and distinct from the November 20, 2020 event, when Plaintiff *Pro Se* made her first complaint of discrimination and Plaintiff *Pro Se* was fully aware of the fact that on November 20, 2020 she was making a complaint of race and gender discrimination to her Supervisor Josh Rice. *(See Exhibit 12; Page 1 No. 2).* It should be noted that on November 9, 2020, Plaintiff *Pro Se* was summoned to Mr. Rice's office and Rusty Erdman was already present in the office and on November 20, 2020, when Plaintiff *Pro Se* made her first complaint of discrimination, she approached Mr. Rice in his office and nobody else was present. *(See Exhibit 13 **AND** Exhibit 11)*

26.     On November 25, 2020 the Defendant held a meeting whereby terminating Plaintiff *Pro Se* was discussed, to replace her with a Caucasian named Grace Kolbert, because of Plaintiff *Pro Se's* supposed work performance on the I-20 Expert Witness Report. *(See Exhibit 15).* At this particular time, the final draft of the I-20 Expert Witness Report had been submitted to the Client over a month earlier, on October 15, 2020 and Plaintiff *Pro Se* had only been employed with the Defendant for just a little over two (2) months. *(See Exhibit 6 **AND** Exhibit 2)*

27.     The Defendant remains vague about the actual date that the final draft of the I-20 Expert Witness Report was submitted to Mr. O'Connell and simply states in "late November". *(See Exhibit 4; Page 12 **AND** Exhibit 7; Page 2 No. 13).* It bares mention that the actual I-20 Expert Witness Report in question, on the second page, has Mr.

O'Connell stamped Professional Engineer's Seal, and in blue ink, he has signed across it, and placed the date of 10/15/20 next to it.  The fact remains the same, regardless of whether it was submitted on October 15, 2020, as the submission date of the actual I-20 Expert Witness Report portrays, or in "late November", it is ludicrous to believe, and a Breach of Mr. O'Connell's Professional Standard of Care to allow Plaintiff *Pro Se*, with no Technical Writing experience in the field of Engineering to draft his Expert Witness Report however, that is the Defendant's contention.  *(See Exhibit 16; Pages 1 & 2).* Keeping in mind that no matter if the report was submitted on October 15, 2020 or in "late November", at best, Plaintiff *Pro Se* would have only been employed with the Defendant for less than three (3) months.  Also of note, Josh Rice states that the Defendant has an obligation to their client to perform their job efficiently and well.  *(See Exhibit 24).*  If the Defendant takes that obligation to their client seriously, it would be unsound to allow Plaintiff *Pro Se* to draft any Expert Witness Report at that stage in her employment, with the skills and abilities she possessed, not to mention, a gross violation of that obligation.  *(See Exhibit 7; Page 2 No. 13 & 14 **AND** Exhibit 4; Page 12).*

28. Something should be said in regards to what the Defendant means by "late November" because Plaintiff *Pro Se* was told on November 20th that she was too new to be able to comprehend the complexities of the I-20 project materials and on November 25, 2020, just five (5) days later, the Defendant held a meeting where they discussed terminating Plaintiff *Pro Se* for her work on the final draft of the I-20 Expert Witness Report.  *(See Exhibit 4; Page 9 **AND** Exhibit 12; Page 1 No. 3 **AND** Exhibit 15)*

29.    The Defendant further discriminated against Plaintiff *Pro Se* and exemplified the hostile,
       bias and disparate treatment they forced her to endure during her employment with
       them by exclusively admonishing her for the work produced on the I-20 Expert
       Witness Report.  No other employee was reprimanded or terminated for their work
       performance on the I-20 Expert Witness Report.  *(See Exhibit 15)*.  Again, Plaintiff *Pro Se*
       was assigned to simply assist Rusty Erdman.  *(See Exhibit 4; Page 8 **AND** Exhibit 7; Page
       2 No. 13 & 14 **AND** Exhibit 6)*.   She was never instructed to draft the I-20 Expert Witness
       Report.

30.    On November 26, 2020, the Defendant made the decision to retain Plaintiff *Pro Se*'s
       employment with them. *(See Exhibit 4; Page 12 **AND** Exhibit 7; Page 2 No. 16)*

31.    On December 1, 2020 at 2:00 PM, the Defendant held an (early) Interim 90 Day
       Introductory Period Performance Review of Plaintiff *Pro Se*'s work performance.  In
       attendance were Plaintiff *Pro Se*, Josh Rice and Cindy Schuerholz.  *(See Exhibit 29)*.  At
       this meeting, yet again, Plaintiff *Pro Se* was forced to endure discriminatorily hostile,
       bias and disparate treatment.  Mr. Rice, one of the Defendant's Vice President's told
       Plaintiff *Pro Se* that she could not write a sentence, much less a paragraph.  *(See Exhibit
       4; Page 1 **AND** Exhibit 3; No. 21)*

              **INTERROGATORY NO. 21.**     What was Joshua Rice's intent at Plaintiff Pro Se's
              Interim Probationary Review meeting when he stated that Plaintiff Pro Se "could
              not even write a sentence, much less a paragraph"?
              **ANSWER TO INTERROGATORY NO. 21.**      Mr. Rice intended to put Plaintiff on
              notice  that her work product, specifically the quality of her writing, was
              deficient. *Id.*

32.    The outcome of this Performance Review was a performance plan in which the
       Defendant promised to send Plaintiff *Pro Se* for Technical Writing training for Engineers

and provided three (3) dates in the future whereby Mr. Rice and Ms. Schuerholz would meet with Plaintiff *Pro Se* again to assess her progress. *(See Exhibit 17)*. After this Performance Review, which began at 2:00 PM and didn't end until after 3:00, Plaintiff *Pro Se* left work for the day.

33. The next morning, on December 2, 2020 at 6:19 AM Plaintiff *Pro Se* made her second complaint of discrimination via email after enduring multiple acts of discriminatorily hostile, bias and disparate treatment, creating the culmination of discrimination that the Defendant points out on page 10 in footnote 7 of their Memorandum in Support of its Motion for Summary Judgment. *(See Exhibit 18)*

34. In this emailed complaint Plaintiff *Pro Se* specifically states that she was "attempting to reach out ... and find a solution ... [because she] believe[d] that [she was] being constructively terminated" and going further, she asked for "some guidance" stating that "[she] did not know what else to do". *(See Exhibit 18)*

35. Prior to sending this email, Plaintiff *Pro Se* took down her pictures and placed them in her vehicle. *(See Exhibit 20)*

36. Sometime between 6:19 AM when Plaintiff *Pro Se* emailed her second complaint of discrimination and approximately 9:27 AM that same morning, the decision to wrongfully and retaliatorily terminate Plaintiff *Pro Se* was made, as evidenced by the timing in the email chain between Cindy Schuerholz, Stan Martin and Plaintiff *Pro Se*. *(See Exhibit 21)*. It is important to note that nothing had changed between the time Plaintiff *Pro Se* had sent her second complaint of discrimination and the Defendant's

decision to terminate her barely 3 hours later.  At 2:30 PM on December 2, 2020, that

very same day, the Defendant terminated Plaintiff *Pro Se*.  *(See Exhibit 22)*

37.    Also of note; throughout the day on December 2, 2020, Plaintiff *Pro Se*, up until her 2:30

wrongful retaliatory termination was still in possession of the work computer and

supplies she was issued by the Defendant and was still working on assigned tasks and

sending and receiving assignments as usual in contradiction to the Defendants

statements regarding Plaintiff *Pro Se* being unwilling to proceed with the Performance

Plan agreed to just the day before.  *(See Exhibit 23)*

38.    From the very beginning of Plaintiff *Pro Se*'s employment on September 16, 2020 until

her eventual wrongful retaliatory termination, Plaintiff *Pro Se* endured multiple acts of

hostile, bias and disparate treatment based upon her race and gender.  The

Defendant enumerates these many events in their Memorandum in Support of its

Motion for Summary Judgment on page 22 and below, Plaintiff *Pro Se* offers this  list to

this Court as well.

- Plaintiff *Pro Se*'s Supervisor, Mr. Rice stating that she couldn't write a sentence, much less a paragraph. *(See Exhibit 3; No. 21 **AND** Exhibit 10; Page 151 Lines 10-21, Page 152 Lines 1-21 & Page 153 Lines 1-10 **AND** Exhibit 4; Page 1)*
- Rusty Erdman making up a story claiming that he and his ex-wife have a Black couple whom they are such good friends with, they put a clause in their Will that, should they die, this Black couple would take in Rusty and his ex-wife's children to raise, however Mr. Erdman could not name this Black couple. *(See Exhibit 10; Page 223 Line 21 & Page 224 Lines 1-17)*
- Plaintiff *Pro Se* being mocked by Rusty Erdman for her attendance at a Historically Black College (HBCU). *Id.*

● Being refused billable work and told by her Supervisor Mr. Rice to ask the people at the Olney office location for billable work, only to later state that "[Plaintiff *Pro Se*] is not responsible [for] searching for billable work". *(See Exhibit 10; Page 172 Lines 20-21 & Page 173 Lines 1-2 AND Exhibit 24 AND Exhibit 25)*

● Enduring multiple comments about Plaintiff *Pro Se's* hair, from it being "neat" and wanting to touch it, to being asked "what happened? I thought you were getting your hair done this weekend" after she had gotten her naturally curly hair straightened. *(See Exhibit 10; Page 104 Lines 6-11 & Page235 Lines 13-21 & Page 236 Lines 1-11)*

● Being required by Mr. Rice to drive over 50 miles from the Baltimore office location to the Olney office location simply to retrieve office supplies when Plaintiff *Pro Se* witnessed his normal practice with other employees was to provide the company credit card so that these same supplies could be purchased from an office supply store near the Baltimore office location. *(See Exhibit 10; Page 175 Lines 13-18)*

● Being forced to endure hostile body language along with hostile words. *(See Exhibit 10; Page 204, Lines 8-21 & Page 205 Lines 1-12 AND Exhibit 4; Page 1)*

● Being told that she could not return to work without a negative COVID test after feeling ill and leaving work early when Grace Kolberg, a Caucasian was allowed to return to work without a negative COVID test when she missed days at work for a stomach ailment, which was a COVID symptom on the CDC's list at that particular time. *(See Exhibit 10; Page 235 Lines 1-12 AND Exhibit 7; Page 3 No. 21)*. It bears mention that Plaintiff *Pro Se* was instructed by her Doctor to get a COVID test however, she was not told that she could not return to work without a negative COVID test by her Doctor.  Mr. Rice informed Plaintiff *Pro Se* that she could not return to work without a negative COVID test.  Despite stomach issues being a symptom of COVID at that time, Ms. Kolberg was not required to obtain a negative COVID test before she could return to work.

## THE ARGUMENT

Plaintiff *Pro Se* was the only Black person employed with the Defendant at the Baltimore office location, and as a Black Female, she is a member of the Title VII Civil Rights Act of 1964 Protected Class.  When she made both of her complaints of discrimination, she was operating in a Protected Activity.  It was the Defendant's unlawful discrimination that Plaintiff *Pro Se* was opposing when she made her complaints of discrimination to the Defendant.  Plaintiff *Pro Se* was forced to endure a culmination of demoralizing and racially hostile comments and treatment from not only her Supervisor but her co-workers as well.  It should be noted, that taken individually, each instance of discrimination would not amount to more than rude treatment as stated by the defendant.  However, taken cumulatively, in light of the November 25th meeting and the December 1st (early) Interim 90 Day Introductory Period Performance Review feigning bad work performance by Plaintiff *Pro Se*, after less than three (3) months of employment as a pretext to terminate her employment and replace her with a Caucasian while simultaneously admitting that as a new employee, she would need time to get up to speed, these instances of discrimination become actionable.

Stanley Martin states in his affidavit that Grace Kolberg took leave for medical issues with non-COVID related symptoms and for that reason she was not required to take a COVID test however, it should be noted that Mr. Martin is not a Medical Doctor and is not an expert on COVID or its symptoms and as such, is not qualified to determine whether an Employee is exhibiting COVID symptoms or not.  It should also be noted that on or around that same timeframe multiple employees who occupied the adjacent office in the Defendant's Baltimore office building had tested positive for COVID and were quarantined, with their office being

abandoned for sanitization.  This admission by Stan Martin is further evidence of the hostile,

bias and disparate discriminatory treatment of Plaintiff *Pro Se* at the hands of the Defendant.

The culmination of all of the incidents mentioned above, coupled with the November

25th predetermined decision to terminate Plaintiff *Pro Se*, then the decision to retain her the

next day, and finally her eventual termination on December 2, 2020 based on the quality of her

work performed on the I-20 Expert Witness Report, only days after stating that it was expected

the I-20 project material would be difficult for Plaintiff *Pro Se* to comprehend, as she was still a

new employee, establishes a *Prima Facie* case of discrimination and wrongful, retaliatory

termination.  These facts create the existence of a genuine issue of material fact when nothing

changed between the Plaintiff *Pro Se*'s December 1, 2020 (early) Interim 90 Day Introductory

Period Performance Review, held in the late afternoon at 2:00 PM, and her complaint of

discrimination the next day, on the morning of December 2, 2020 at 6:19 AM.

The Defendant contends that their decision to terminate Plaintiff *Pro Se* was not based

on discrimination, yet Joshua Rice, Rusty Erdman nor Grace Kolberg were treated the same as

Plaintiff *Pro Se*.  In fact, they were treated as privileged employees, all of whom are Caucasian.

Neither Mr. Rice, Mr. Erdman nor Ms. Kolberg were officially admonished, disciplined or

terminated for their roles in the I-20 Expert Witness Report, even though they had more time,

experience, and knowledge with the work product required, and more time working on the I-20

project than Plaintiff *Pro Se*.  All three of these people had been employed with the Defendant

longer than Plaintiff *Pro Se*, and the Defendant "had been analyzing ... [the I-20 project] for an

extended period of time".  Also of note, Plaintiff *Pro Se* was simply assigned to assist Mr.

Erdman with the I-20 Expert Witness Report.  Ms. Kolberg was assigned to assist Plaintiff *Pro Se*

in her efforts to assist Mr. Erdman. This is more evidence of hostile, bias and disparate

discriminatory treatment towards Plaintiff *Pro Se*.

It would be reasonable to assume that the work Plaintiff *Pro Se* performed would be

closely monitored and periodically reviewed by either Mr. Rice or Mr. Erdman or even both Mr.

Rice and Mr. Erdman.  Mr. Erdman is a Senior Construction Consultant and Mr. Rice is not only

a Vice President with the Defendant, but also an Expert in Technical Writing.  *(See Exhibit 12;*

*Page 1 No. 1 **AND** Exhibit 26).*  Taking all these facts into consideration, it is obvious that the

early (Interim) 90 Day Introductory Period Performance Review of Plaintiff *Pro Se* on December

1, 2020 was simply a pretext to the continuation of the hostile, bias and disparate

discriminatory treatment, which culminated in Plaintiff *Pro Se*'s eventual wrongful retaliatory

termination on December 2, 2020.

Noteworthy are the multiple reasons the Defendant has provided as to why they

wrongfully retaliatorily terminated Plaintiff *Pro Se*.  The first reason provided was "[Plaintiff *Pro*

*Se* was] terminated ... based upon [her] performance of the work that was required ...." *(See*

*Exhibit 19).*  The next reason provided was that Plaintiff *Pro Se* resigned.  *(See Exhibit 3; No. 2).*

The third reason provided was that she was constructively terminated, and finally, the fourth

reason provided was that she "refus[ed] to move forward with the performance improvement

plan".  *(See Exhibit 3; No. 23 **AND** Exhibit 4; Page 2)*

> **INTERROGATORY NO. 2.**     Who was involved in the final decision to terminate
> Plaintiff Pro Se and when, approximately, and why was that decision made and
> for what purpose?
> **OCL ANSWER TO INTERROGATORY NO. 2.**   Plaintiff resigned in the early
> morning hours of December 2, 2020 when she sent an email saying she was
> being "constructively terminated," and cleaned out her office prior to sending
> the email. Subsequent to her December 2, 2020 resignation and email, which
> made clear that Plaintiff was unwilling to take the steps necessary to improve

her performance, on the following day, Stan Martin sent her an email confirming the termination of her employment. Ken O'Connell, Stan Martin, Cindy Schuerholz, and Josh Rice were involved in the decision.  *(See Exhibit 3; No. 2)*

On December 2, 2020, while Plaintiff *Pro Se* did "[take] down her pictures" as Gene Quickel stated, she did so under the reasonable assumption she would be removed from the hostile environment she was now forced to work in and relocated to the Defendant's Olney office.  Gene Quickel was the individual who stated that "it looks like you are clearing out." *(See Exhibit 20).*  After claiming that Plaintiff *Pro Se* resigned, the Defendant went on to state that she was constructively terminated.  *(See Exhibit 3; No. 23)*

> **INTERROGATORY NO. 23.**     Did Stanley Martin, Cindy Schureholz (sic), Joshua Rice or anybody else employed by the Defendant, interview Plaintiff Pro Se after she made either of her 2 race and gender discrimination complaints, and if so, when, where, and what was the ultimate resolution, and were there formal notes to memorialize the investigatory process in keeping with the Defendant's policies and procedures for such complaints as race and gender discrimination?
> **OCL ANSWER TO INTERROGATORY NO. 23.**     See, Answers to Interrogatories Nos. 6 and 7. OCL had no opportunity to interview Plaintiff after receipt of her December 2, 2020 email in which she indicated that she had been constructively terminated. Pursuant to Fed. R. Civ. P. 34(e), Defendant will produce documents from which the Answer to this Interrogatory may be derived or ascertained. *Id.*

## CONCLUSION

To establish a *Prima Facie* case for discrimination and wrongful retaliatory termination Plaintiff *Pro Se* offers the fact that her second and final complaint of discrimination was the causal, but-for connection of her retaliatory wrongful termination based upon the timing between the events:

1.      the November 25, 2020 decision to terminate Plaintiff *Pro Se* and give her

    employment position to a Caucasian, then,

2.      on November 26th, the next day, the Defendant made the decision to retain

Plaintiff *Pro Se*'s employment

3.      only terminate Plaintiff *Pro Se* on December 2nd, within hours of her second

complaint of discrimination.

Contrary to the Defendant's stated position on page 2 of their Memorandum in Support

of their Motion for Summary Judgment, it was the Defendant who demonstrated a refusal to

move forward with the Performance Plan agreed to on December 1st, and further exemplifies

their hostile, bias and disparate discriminatory treatment of Plaintiff *Pro Se*.

Having studied such employment discrimination in law school, Plaintiff *Pro Se* had a

reasonable, good faith belief at the time of both of her complaints of discrimination that the

Defendant was engaging in ongoing, unlawful Title VII violative practices and this belief is

objectively reasonable in light of the circumstances and facts in the record presented.

### PROTECTED CLASS & ACTIVITY

Plaintiff *Pro Se*, as a Black Female is a member of the Title VII Civil Rights Act of 1964

Protected Class and she was engaged in a Protected Activity each time she complained of the

hostile, bias and disparate discriminatory treatment she suffered at the hands of the

Defendant.

The Defendant would have this Court believe that Plaintiff *Pro Se* did not possess an

objective, good faith belief that she was being discriminated against at the time of her first

complaint of discrimination on November 20, 2020.  To that end, the Defendant is attempting

to confuse this Court by incorporating two incidents that they know are distinctly separate.

On November 6, 2020, Plaintiff *Pro Se* exchanged text messages with another employee of the Defendant's named Bob Nash regarding COVID.  These text messages were discussed by the Plaintiff *Pro Se* with other employees of the Defendant's during a jovial conversation in reference to Bob Nash and his fear of COVID.  Rusty Erdman was among the employees present during this conversation regarding Bob Nash's fear of COVID and the text messages Plaintiff *Pro Se* received from Bob Nash regarding COVID.

On November 9, 2020, Plaintiff *Pro Se* was summoned to Joshua Rice's office regarding these text messages, and Rusty Erdman was present.  Rusty Erdman had asked Plaintiff *Pro Se*, on November 8th, to forward him the text message exchange between Bob Nash and Plaintiff *Pro Se*, which Plaintiff *Pro Se* did, because she believed that he wanted them in furtherance of the jovial nature of the previous November 8th conversation.  Plaintiff *Pro Se* never thought that Rusty Erdman would make an official company complaint regarding these text messages on her behalf.  *(See Exhibit 13)*

On November 10, 2020, Plaintiff *Pro Se* received an email from Cindy Schuerholz asking Plaintiff *Pro Se* to come to the Defendant's Olney office location to meet with her and Stanley Martin to discuss the text message exchange between Plaintiff *Pro Se* and Bob Nash.  Plaintiff *Pro Se* responded to that email by explaining that she would indeed come to the Olney office and meet with Ms. Schuerholz and Mr. Martin, but she did not believe there existed an issue that warranted an official intervention by the company's Human Resource Director and their In-House Counsel.  With that, Ms. Schuerholz stated "OK - thanks.  No need to come down."  *(See Exhibit 14)*

On November 19, 2020, when Mr. Rice stated to Plaintiff *Pro Se* that she could not possibly comprehend the I-20 project material she was reading, Plaintiff *Pro Se* believed that to be another act of discrimination towards her by Mr. Rice, in furtherance of his hostile, bias and disparate treatment of her, and as such, she decided it was time to make an official complaint of discrimination. On November 20, 2020, to affect this discrimination complaint, Plaintiff *Pro Se* went to Mr. Rice's office, and attempted to bring levity to the situation by jokingly stating "Josh, you and I are going to have a knife fight". *(See Exhibit 11).* Mr. Rice chuckled and asked Plaintiff *Pro Se* what the issue was, and she explained how she believed his statement regarding her inability to comprehend the I-20 project materials was discriminatory.

Mr. Rice then stated that it was not his intention to be discriminatory but rather to relay to Plaintiff *Pro Se* that "the I-20 project [was a] major project that [the Defendant] had been analyzing for an extended period of time, and [Plaintiff *Pro Se*], as a new employee, would need time to get up to speed on the substance of the project". *(See Exhibit 12; Page 1 No. 3 **AND** Exhibit 4; Page 9)*

As stated in the Facts section of this document above, in an attempt to confuse this Court, the Defendant is choosing to combine both the November 9th, "Bob Nash" incident, whereby Plaintiff *Pro Se* made it clear that she took no issue with Mr. Nash, and the November 20th issue where Plaintiff *Pro Se* made it very clear that she took issue with Mr. Rice. It should be noted that on November 9th, Plaintiff *Pro Se* was summoned to Mr. Rice's office and Rusty Erdman was present. On November 20th, Plaintiff *Pro Se* approached Mr. Rice in his office of her own accord and nobody else was present.

The Defendant is also using Plaintiff *Pro Se*'s emailed statement to Cindy Schuerholz on

November 10th, that she had no issue with Bob Nash, to try to convince this Court that when

she made her first complaint of discrimination, she did not believe she was actually

discriminated against, hence the Defendant's position that Plaintiff *Pro Se* did not have a good

faith, objective belief that she was engaging in a protected activity, when in fact, Plaintiff *Pro Se*

did not make her first complaint of discrimination until November 20, 2020.  *(See Exhibit 14)*

> **INTERROGATORY NO. 6.**     Was there an investigation or any type of
> investigatory inquiry into Plaintiff Pro Se's first, verbal race and gender
> discrimination complaint to her immediate Supervisor, Vice President Joshua
> Rice, and what did that investigation entail, what individuals were involved in
> that investigation, when was that investigation, are there investigatory notes or
> something similar, and what was the ultimate outcome of that investigation?
> **OCL ANSWER TO INTERROGATORY NO. 6.**   Defendant assumes that "first verbal
> race and gender discrimination complaint" is meant to refer to the "complaint"
> made to Rusty Erdman and Josh Rice referenced on page 3-4, Section A, of
> Plaintiff's Complaint. Although Plaintiff made a complaint to Mr. Erdman and Mr.
> Rice in November 2020, when OCL attempted to investigate, Ms. Johnson denied
> that she had made a "discrimination" complaint which needed to be
> investigated. Pursuant to Fed. R. Civ. P. 34(e), Defendant will produce documents
> from which the Answer to this Interrogatory may be derived or ascertained.
> *(See Exhibit 3; No. 6)*

### SATISFACTORY JOB PERFORMANCE

On September 16, 2020, when the Defendant hired Plaintiff *Pro Se*, they stated that they

did so because of her "education and prior experience", and in fact, hired Plaintiff *Pro Se*

without even interviewing her.

> **INTERROGATORY NO. 10.**     Has the Plaintiff Pro Se ever been interviewed by
> the Defendant or any of their agents, assignees, employees or otherwise, and
> when, where and what individuals were involved in this interview, and were
> there interview notes, and what information in Plaintiff Pro Se's resume
> prompted the Defendant to hire Plaintiff Pro Se?
> **OCL ANSWER TO INTERROGATORY NO. 10.**      No interview was conducted
> prior to Defendant hiring Plaintiff. Robert Nash and/or Stan Martin may have
> informally met with Plaintiff prior to her performing work as an employee of her

husband's company, Michael Dobson Contracting Corp., which had been previously retained by Defendant. Plaintiff was offered employment based upon her education and prior experience. *(See Exhibit 3; No. 10)*

Again, the "prior experience" mentioned was obtained when Plaintiff *Pro Se* "work[ed] for the [Defendant] as an employee of her husband's company, Michael Dobson Contracting Corp[.], which acted as a consultant for [the Defendant] for approximately 18 months". Plaintiff *Pro Se* performed Document Review services for the Defendant at that time. *(See Exhibit 4; Page 7 Footnote 5)*. During this time, while obtaining "prior experience" working with the Defendant, the Defendant believed Plaintiff *Pro Se*'s job performance was "satisfactory" enough to offer her a $5.00 an hour raise. As stated below, this decision was in the Defendant's "sole discretion".

> "Other Personnel from the Consultant will be paid on an hourly fee basis at the provisional rate of Thirty-Five Dollars ($35.00) per hour, billable in quarter-hour (0.25) increments. At the sole discretion and judgement of the Company, if performance of Other Personnel is satisfactory, and after 8 weeks, the provisional rate will be increased to Forty Dollars ($40.00) per hour for the remainder of the agreement." *(See Exhibit 5; Service Fees)*

It is obvious that the Defendant intended to discriminate against Plaintiff *Pro Se* in regards to her job performance based on the timing between November 20th, when Mr. Rice told Plaintiff *Pro Se* that as a new employee, she would need time to get up to speed on the I-20 project and five days later, on November 25th, when the Defendant made the decision to terminate Plaintiff *Pro Se* for her work performance on the I-20 Expert Witness Report. Plaintiff *Pro Se* believes that the Defendant feigned bad work performance on her part in order to terminate her and replace her with a Caucasian.

It should be noted that Plaintiff *Pro Se* was terminated prior to the end of her 90 Day Introductory Period. The Defendant's Employee Manual designates the "... first ninety (90)

days of employment at O'Connell & Lawrence, Inc. [as] ... an Introductory Period ... This Introductory Period will be a time for getting to know ... the tasks involved in your job position ... Your manager will work closely with you to help you understand the needs and processes of your job." "At the end of the Introductory Period, your manager will discuss your job performance with you." *(See Exhibit 27; Page 13)*

If the Defendant's 90 Day Introductory Period is designed for training the employee and allowing the employee time to get to know the tasks involved with their job position, one would assume that being terminated prior to the end of the 90 Day Introductory Period would require gross malfeasance in ones assigned tasks.

It is the Defendant's position that because Plaintiff *Pro Se*'s employment position was At-Will and Plaintiff *Pro Se* was terminated within her 90 Day Introductory Period, that discriminating against her and wrongfully retaliating against her by terminating her for making a complaint in reference to that discrimination was legal, and as such, Plaintiff *Pro Se* has no cause of action. However, it is well established in the state of Maryland and Federally that an Employer cannot discriminate against an Employee, and then retaliate against that Employee when they make a complaint about the discrimination, regardless of the At-Will status of the employment position.

According to Mr. Rice, on November 20th, while within her 90 Day Introductory Period, Plaintiff *Pro Se* was still being acclimated to her assigned tasks (the I-20 project) and was not expected to perform her job at a "satisfactory" level as yet. *(See Exhibit 4; Page 9 **AND** Exhibit 12; Page 1 No. 3)*

This begs an inquiry into the real reason the Defendant provided for the decision to terminate Plaintiff *Pro Se* 5 days later, on November 25, still well within the Plaintiff *Pro Se*'s 90 Day Introductory Period. *(See Exhibit 15).* The Contemporaneous Notes from the November 25, 2020 Meeting make it clear. The Defendant wanted to further their hostile, bias and disparate discriminatory treatment of Plaintiff *Pro Se* by terminating her and replacing her with a Caucasian.

Plaintiff *Pro Se* contends that her job performance was not the real reason for her termination, recalling that the Defendant has put forth multiple reasons for Plaintiff *Pro Se*'s termination during this entire lawsuit, ranging "from the quality of her work", to "a refusal to move forward with the performance plan", to claiming "she resigned", to last but not least, that "she was constructively terminated". Ultimately, it was obvious that the Defendant, angry about the complaints of discrimination, and in furtherance of their hostile, bias and disparate discriminatory treatment of Plaintiff *Pro Se* wished to replace her with a Caucasian and made-up different reasons to end her employment with them to effectuate that end.

As a parting thought, in reference to Plaintiff *Pro Se*'s work performance and whether or not the Defendant was furthering their discrimination against her when they attacked her writing ability and stated that she could not write a sentence, much less a paragraph, this Court's own United States Magistrate Judge Timothy Sullivan stated in his May 23, 2022 Memorandum Opinion that Plaintiff *Pro Se* had "demonstrated [an] ability to read and communicate in writing". *(See Exhibit 4; Page 1 **AND** Exhibit 3; No. 21 **AND** Exhibit 28; Page 3)*

**THE ADVERSE EMPLOYER ACTION AND THE CAUSAL/BUT-FOR CONNECTION**

As stated above multiple times, the Defendant, though their November 25, 2020 plan was to terminate Plaintiff *Pro Se* and replace her with a Caucasian, had decided to retain her employment and extend her probation 60 days. *(See Exhibit 4; Page 12 **AND** Exhibit 7; Page 2 No. 16)*

However, after receiving the Plaintiff *Pro Se*'s second complaint of discrimination via email at 6:19 AM on the morning of December 2, 2020, that all changed, and they have yet to provide a consistent reason for Plaintiff *Pro Se*'s wrongful retaliatory termination.  On December 1, 2020, at approximately 2:00 PM, after all parties agreed to move forward with an extended 60 Day Probationary Period which included Engineering Technical Writing Training Courses, Plaintiff *Pro Se*'s second complaint of discrimination enraged the Defendant, and they acted with haste and malice as evidenced, again, by the timing involved.  At some time prior to 9:26 AM on the morning of December 2nd, just a few hours after receiving Plaintiff *Pro Se*'s email, the Defendant decided to terminate her, and did in fact do so, later that afternoon. *(See Exhibit 21 **AND** Exhibit 22)*

Plaintiff *Pro Se*'s December 2nd email was not only her second complaint of discrimination, but she was specifically requesting help to find a solution and some guidance to what she believed was an ongoing problem with her race and gender. *(See Exhibit 18).*  As previously mentioned, Plaintiff *Pro Se* was still submitting and receiving assigned work tasks the entire day on December 2nd, up until her termination. *(See Exhibit 23)*

It is obvious that between the December 1st early (Interim) 90 Day Introductory Period Performance Review meeting at 2:00 PM, and the Plaintiff *Pro Se*'s second complaint of

26

discrimination at 6:19 AM on the morning of December 2nd that nothing had changed drastically enough to warrant Plaintiff *Pro Se*'s immediate termination, and that the Defendant terminated Plaintiff *Pro Se* in furtherance of their continued hostile, bias and disparate discrimination, creating the causal but-for connection between Plaintiff *Pro Se*'s second complaint of discrimination and the Defendant's act of wrongful retaliatory termination.

### DIFFERENT TREATMENT FOR SIMILARLY SITUATED EMPLOYEES OUTSIDE THE PROTECTED CLASS

At the November 25, 2020 meeting, no other employee was singled out regarding the I-20 Expert Witness Report except Plaintiff *Pro Se*. *(See Exhibit 15).* As stated above, and in the Defendant's Memorandum in Support of its Motion for Summary Judgment on page 8, Plaintiff *Pro Se* was only assigned to assist Rusty Erdman on the I-20 Expert Witness Report. Also previously mentioned in the Memorandum in Support of its Motion for Summary Judgment, on page 9, was the well established fact that Plaintiff *Pro Se* was still too new of an employee to be able to provide the necessary experience and expertise to the I-20 Expert Witness Report, solely because of the project's complexity.

Joshua Rice and Rusty Erdman had been working on the I-20 project well before Plaintiff *Pro Se* began her employment with the Defendant. Grace Kolberg, the Caucasian who the Defendant decided to place in Plaintiff *Pro Se*'s employment position once they terminated Plaintiff *Pro Se* was assigned to assist Plaintiff *Pro Se* in her efforts to assist Rusty Erdman. Grace Kolberg had also been employed with the Defendant long before Plaintiff *Pro Se* began her employment with the Defendant and had also worked on the I-20 project assisting Rusty Erdman prior to Plaintiff *Pro Se*'s arrival.

Neither Joshua Rice, Rusty Erdman, both Caucasian males, nor Grace Kolberg, a Caucasian female were officially admonished or terminated for their work performance on the I-20 Expert Witness Report, and Mr Rice, Mr. Erdman and Ms. Kolberg were similarly situated to Plaintiff *Pro Se*, and all three, Mr Rice, Mr. Erdman and Ms. Kolberg are outside of the Title VII Protected Class.

Taken in the light most favorable to the nonmoving party, the facts as presented herein and those in the record before this court, make the discrimination Plaintiff *Pro Se* complained of, and the resulting wrongful retaliatory termination, more probable than not. For this reason, and as outlined in this response to the Defendant's Motion for Summary Judgment, Plaintiff *Pro Se* asks this Court to rule in her favor and deny the Defendant's Motion for Summary Judgment.

## DAMAGES

There is no guesswork and nothing speculative about the figures put forth in Plaintiff *Pro Se*'s calculation of damages. In fact, her calculations are very specific as to the amount, the reasons for the amount, and the sources she used to assess those amounts. The damages were calculated using information tables from the United States Department of Labor's Bureau of Labor Statistics and the EEOC's Management Directive, Chapter 11 Remedies.

https://www.bls.gov/news.release/pdf/tenure.pdf and (https://www.eeoc.gov/federal-sector/management-directive/chapter-11-remedies)

Plaintiff *Pro Se* also utilized her W2 from the Defendant, the Defendant's own Employee Manual for wage, benefits and bonus information, as well as the various receipts from expenses she incurred over the time employed with the Defendant.

Plaintiff *Pro Se* has also been attempting to mitigate her damages by working with her North Carolina Employment Commission's Veterans Counselor Zachary Branch, and her Department of Veteran's Affairs Disabled Veterans Vocational Rehabilitation Services Counselor Annette Ruth seeking employment in almost every area possible, considering her education and skill level.

Plaintiff *Pro Se* was terminated during COVID, which made obtaining new employment very difficult and now the entire Country is dealing with an economic downturn that has compounded the problem as there are a plethora of employment positions available however, many Employers simply cannot afford to fill them. Plaintiff *Pro Se* has gone on many interviews without success, however she continues to apply for the positions available that match her skills and education level. She has spent time working for her husband again at his company Michael Dobson Contracting Corp. This is the same company she was working with when she began working with the Defendant. *(See Exhibit 4; Page 7 Footnote 5)*

Plaintiff *Pro Se* is asking for lost wages for four years based on the tables used by the U.S. Department of Labor's Bureau of Labor Statistics and what her salary was when she was wrongfully retaliatorily terminated. The actual calculation through longevity of employment states 4.1 years is the average employment tenure for employees. With that, the calculations are as follows:

$490,495 for lost wages for four years
The following calculations are based on employment tenure of 4.1 years, not 4, and for lost wages, benefits and bonuses.

$490, 495.00 ÷ 4.1 years = 119,632.927 on average, which equates to an annual salary of $77,000 per year = $315,700 + 4% annual increases $320,270.86 - $13,919.19 for the approximate three (3) months worked.

The total amount for lost wages, benefits, and bonuses = $320,276.86.

*See breakdown below*:

1st Year = $77,000.00 - $13,919.19

2nd year + 4% = $80,080.00

3rd Year + 4% = $83,283.20

4th Year + 4% = $86,614.56

4.1 Year + 4% = $7,218.29

Plus lost benefits for 4.1 years calculated at 20%, and not the Bureau of Labor Statistics 30% due to the fact that not all of the offered benefits were available to Plaintiff *Pro Se* at that time in her employment.

Total gross pay = $64,055.37

Total bonuses of $106,162.77 ÷ 4.1 = $25, 893.35 per year.

Plaintiff *Pro Se* had already accrued 20 Months of lost back pay as of August 2, 2022.

It should be noted that the Department of Labor's, Bureau of Labor Statistics shows that an average of 4.9 to 5.1 years of employment tenure would be more applicable to Plaintiff *Pro Se*'s employment position, not the 4.1 years which the calculations were based on for prudence while adding back pay of 20 months as of August 2, 2022 per the EEOC's Management Directive, Chapter 11 Remedies and front pay of 29 months based on the same guidelines for average employment tenure.

Also, when calculating her damages, Plaintiff *Pro Se* took into consideration her age, the length of time she had been employed with the Defendant, the length of time it would/is taking to obtain similar employment utilizing reasonable efforts, her life expectancy, and the typical

time other employees held positions with the Defendant, to include the typical length of time Plaintiff *Pro Se* would have held her employment with the Defendant had she not been wrongfully retaliatorily terminated.

Plaintiff *Pro Se* included in her damages calculation the cost of moving from North Carolina to Maryland, the security deposit and the rent for her apartment, the moving truck rental, the utilities and the necessary boarding for her dogs while she moved.  She also included the household items and furniture she had to purchase, as she did not give up her home in North Carolina.  She simply relocated some of her things from North Carolina to Maryland.  The furnishings and household goods that Plaintiff *Pro Se* did not move from North Carolina to Maryland, she had to repurchase.

The Defendant knew when they hired Plaintiff *Pro Se* that she was the Medical Power of Attorney for her sister who was in a vegetative state due to a Neurological issue at the time of hiring, and because of that, Plaintiff *Pro Se* would need to return to North Carolina from time to time to meet with her sister's Neurologist and his Team.  The Neurologist had his Team work with Plaintiff *Pro Se*'s absence as best as they could and only summoned her when absolutely necessary, however, over the almost three (3) months Plaintiff *Pro Se* was present at the Baltimore Office, the trips back and forth to the Baltimore office from North Carolina at the start of her employment including the delta for additional expenditures calculates to a total of $11,369.75. with vehicle maintenance costs, tolls and gas.

When Plaintiff *Pro Se* was wrongfully terminated, she had to cover the cost of the move from Maryland, back to North Carolina, as well as the cost of breaking the lease on her

apartment. The costs associated with moving back to North Carolina from Maryland were very similar to the costs associated with moving to Maryland from North Carolina.

The Defendant's own Employee Manual, on page 45 dictates the dress code and personal appearance Plaintiff *Pro Se* was expected to abide by so Plaintiff *Pro Se* does not understand why the Defendant is denying her the costs associated with obtaining Professional apparel and the necessary grooming to abide by the Defendant's own rules. *(See Exhibit 27; Page 45)*

Plaintiff *Pro Se* worked from home in North Carolina at the start of her employment, utilizing her own computer and printer and internet service. Not to mention the necessary accoutrements for those items, like printer ink and paper.

Plaintiff *Pro Se* calculated her damages based on the EEOC's caps and what they allow, and their limits, and the amount of Punitive damages she is requesting are $150,000 based on the Mental Anguish suffered at the hands of the Defendant as proven by her PTSD diagnosis and the fact that she is still, currently undergoing regular mental health treatment for PTSD with a Psychologist because of the horrible treatment inflicted on her by the Defendant during her employment tenure. *(See Exhibit 1)*

Taking into consideration everything mentioned above, and by analyzing all of the circumstances existing at that time and now, Plaintiff *Pro Se* is asking this Court to award her total damages in the amount of $663,204.75, which is less than the original amount requested due to a recalculation and some mitigation.

*Jerri Joann Johnson*

Plaintiff *Pro Se*, Jerri Joann Johnson

July 25, 2022
Jerri Joann Johnson
407 South William Street
Goldsboro, NC 27530
jerrijoann50@icloud.com
(919)501-1982

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 25th day of July 2022, copies of the foregoing Plaintiff *Pro*

*Se*'s Response to the Defendant's Motion for Summary Judgment, was served via First Class

Mail to:

Shirlie Norris Lake,
Attorney for the Defendant
ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378
E-mail: lake@ewmd.com

*Jerri Joann Johnson*

Plaintiff *Pro Se*, Jerri Joann Johnson

July 25, 2022
Date

1