IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JERRI JOANN JOHNSON                        :

                                          :

    v.                                    :    Civil Action No. DKC 21-2468

                                          :

O'CONNELL & LAWRENCE, INC.                :

## MEMORANDUM OPINION

Presently pending and ready for resolution in this employment discrimination case is the motion for summary judgment filed by Defendant O'Connell & Lawrence, Inc. ("Defendant" or "OCL") (ECF No. 43). Also pending are two motions for leave of court filed by Plaintiff Jerri Johnson, appearing *pro se*. (ECF Nos. 50, 53). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion for summary judgment will be granted in part and denied in part. Plaintiff's motions, construed as motions to seal, will be denied.

## I.   Background

Defendant is a "multidisciplinary engineering and consulting firm" with a headquarters located in Olney, Maryland and a satellite office located in Baltimore, Maryland. (ECF No. 43-5 at 1). Plaintiff began working for Defendant in the Baltimore office as a Construction Consultant on September 16, 2020. (ECF Nos. 43-5 at 2, 43-4 at 67). Plaintiff had previously worked with

Defendant as an employee for her husband's company, which had a consulting contract with Defendant.  (ECF Nos. 1 at 3, 8 at 2; *see also* ECF Nos. 43-3 at 7 n.5, 43-10 at 1).  Per the terms of her offer of employment, the first 90 days of her employment was an "Introductory Period," during which she was to be "oriented to corporate procedures and receive training on procedures."  (ECF No. 43-12).  At the end of the 90 days, she was to receive a performance evaluation, and if she was deemed to have satisfactorily completed her Introductory Period, she was to be converted to regular, full-time employee status.

Plaintiff is a Black woman and the only non-Caucasian employee that worked at the Baltimore office during the time that she worked there.[1]  (ECF No. 8 at 2).  She was supervised by Josh Rice.  (ECF No. 43-5 at 1).  Among Plaintiff's responsibilities was drafting expert witness reports.  (ECF No. 43-5 at 2).  Early in her employment, she was assigned to work with a co-worker, Bennett "Rusty" Erdman, to prepare an expert witness report related to the "Interstate 20 Project," or "I-20 Project."  She was also tasked with working with Mr. Erdman to create a "study binder" to help prepare the company's president for expert witness testimony regarding the I-20 Project.

---

[1] This terminology and capitalization are used by the parties.

According to Plaintiff, she began experiencing discrimination "[i]mmediately[] upon arrival" at the Baltimore office.  (ECF No. 48 at 3).  She asserts that Mr. Erdman "ma[de] up a story" about having a close friendship with a Black couple and that he "mocked" her for attending a Historically Black College.  (ECF No. 48-10 at 45-46).  Plaintiff also asserts that other employees made comments about her hair being "neat."  (ECF No. 48-10 at 47).  Plaintiff recalls that on multiple occasions, other employees ordered lunch for everyone else in the office except her.  (ECF No. 43-3 at 16).[2] On one occasion, Plaintiff recalls that she asked Mr. Rice for office supplies, and he instructed her to drive to the Olney office to pick up the supplies.  (ECF No. 48-10 at 14, 16-20).  However, she was told by another employee that Mr. Rice usually provided the company credit card to employees who requested office supplies so that they could purchase the supplies nearby rather than drive to Olney.

Plaintiff asserts that, on another occasion, after she reported having a sore throat, she was instructed not to return to work until receiving a negative result on a COVID-19 test, yet around the same time, another employee was able to return to work

---

[2] Defendant's motion contains a quoted portion of Plaintiff's deposition wherein she discussed this issue.  However, that portion of the deposition, apparently at page 231, was left out of the excerpted copy provided as an exhibit by both parties.  (ECF Nos. 43-4, 48-10).

after reporting a "stomach" issue without having to take a COVID-19 test.  (ECF Nos. 48-10 at 47, 43-5 at 3).  Plaintiff also recalls that at one point, Mr. Rice refused to assign her billable work and instructed her to seek out billable work at the Olney office, yet he "gave billable work to everyone else."  (ECF No. 48-10 at 11-12).  Plaintiff recalls occasions when Mr. Rice "picked on [her] relentlessly with little nit-picky things" and when he "refused to allow [her] any say so in anything," including regarding holiday decorations.  (ECF No. 48-10 at 14, 38).  Defendant disputes certain aspects of Plaintiff's account of these incidents.

Plaintiff recalls that, on November 19, 2020, Mr. Rice told Mr. Erdman that Plaintiff "did not have the ability to comprehend what [she] was reading," referring to emails she was sorting through while preparing the study binder.  (ECF Nos. 43-3 at 9, 48 at 4-5, 48-10 at 11).[3]  Plaintiff believed Mr. Rice improperly "assumed" she did not have the ability to understand the emails. In an affidavit, Mr. Rice stated that he

> questioned whether Ms. Johnson could "comprehend" the material she was reading in November of 2020 . . . because she was reviewing emails pertaining to the I-20

---

[3] Defendant's motion contains a quoted portion of Plaintiff's deposition wherein she discussed this issue, but, again, that portion of the deposition, apparently at pages 151-53, was left out of the excerpted copy provided as an exhibit by both parties. (ECF Nos. 43-4, 48-10).  Plaintiff's response also contains this quoted portion.

> project, a major project that OCL had been
> analyzing for an extended period of time, and
> Ms. Johnson, as a new employee, would need
> time to get up to speed on the substance of
> the project.

(ECF No. 43-13 at 1).

Plaintiff asserts that the next day, on November 20, 2020, she approached Mr. Rice and made a "race discrimination and gender discrimination complaint." (ECF No. 48-10 at 10). When asked during her deposition what caused her to make this complaint, Plaintiff testified that it was a "culmination of things," citing many of the aforementioned incidents. (ECF No. 48-10 at 10-25). Mr. Rice documented that meeting in an email days later to the Vice President of Human Resources and Accounting, Cindy Schuerholz. (ECF No. 43-14). In that email, he described that Plaintiff began the conversation by saying, "[Y]ou and I are going to have a knife fight." She then told Mr. Rice that he needed "sensitivity training and that [he] obviously ha[d]n't worked around enough women—especially black women like [her]—in [his] career." The remainder of the email reflects that Mr. Rice understood Plaintiff's complaint to be related to his investigation into an exchange she had with a co-worker, Bob Nash, which Plaintiff had shared with a co-worker who then reported it on Plaintiff's behalf—Plaintiff told Mr. Rice that he

"overreacted" about this issue.[4]   However, Plaintiff asserts that Mr. Rice's email "left out quite a bit of information" about the contents of their conversation, including her having expressed that she "felt like he was discriminating against [her] for [her] color and [her] gender."  (ECF No. 48-10 at 10).

On November 25, 2020, there was a meeting of members of Defendant's management team, including Mr. Rice; Ms. Schuerholz; Stan Martin, Defendant's Executive Vice President and General Counsel; and Dr. Kenneth O'Connell, Defendant's President. According to notes Ms. Schuerholz took during the meeting, it was discussed that Dr. O'Connell was "disappointed" by the I-20 Project report Mr. Erdman and Plaintiff had prepared—the notes state that the "draft report was terrible" and that Dr. O'Connell and Mr. Martin "had to clean up [the] report and re-write" it.  (ECF No. 43-8).  A subsequent section of the notes is labelled "J. Johnson," and it reads as follows:

> [D]iscussed [I-20 Project] report.  Ken and Stan not happy with writing quality of report. Seems to be very poor.  Josh/Rusty have same feeling about her writing product—what we do doesn't fit her skill set.  Ken—would it hurt if you cut her loose?  Josh—No
> Have a performance evaluation with her next week, discuss her attendance record, extend

---

[4] Plaintiff explains in her response to Defendant's motion that she showed co-workers a text message exchange she had with Mr. Nash regarding his "fear of COVID" and that when she was later contacted to participate in an investigation into this incident, she refused because she believed "there [was] no issue."  (ECF No. 48 at 7-8; *see also* ECF No. 48-14).

> probation 60 days, give her expectations in
> meeting.  Must meet expectations and then be
> reviewed again, list everything she is not
> performing well with.   After further
> discussion, decision was made by Ken/Stan to
> terminate employee.  Everyone agreed.

However, according to Mr. Martin's affidavit, Mr. Rice called Mr. Martin the following day and "suggested that instead of terminating Ms. Johnson's employment, OCL should extend her probationary period[] and work with her to improve her writing, which OCL ultimately agreed to do."  (ECF No. 43-5 at 2).

Plaintiff's "Interim Performance Review" meeting took place on December 1, 2020.  Plaintiff, Mr. Rice, and Ms. Schuerholz attended the meeting.  According to notes Mr. Rice took (and Ms. Schuerholz typed) during the meeting, it was discussed that Plaintiff's probationary period would be extended by 60 days.  (ECF Nos. 43-15, 48-10 at 31).  The notes reflect that Mr. Rice stated his "[e]xpectations going forward," which included that Plaintiff needed to "further develop [her] writing skills."  (ECF No. 43-15).  They also discussed issues with Plaintiff's attendance, although it is noted that her absences from work were due to her "illness" and her "sister's death."  The notes then include a list titled "We will work on," which includes "Writing—currently you are writing in a legal tone, we need to change that to an engineering tone—need to get writing style down."  It is later noted that Plaintiff said, "Technical writing is not my background—

OCL could hire a college graduate[] who could have better technical writing skills.  Would understand if [OCL] wanted to do that." The notes conclude with a section titled "Going Forward," which says, "Josh will continue to work with Jerri" and "Will meet again to review progress to date: December 15th, January 7th, January 28th[,] and February 12th."  According to Plaintiff, at some point during this meeting, Mr. Rice told her that she "could not write a sentence, much less a paragraph."  (ECF Nos. 48-3 at 9, 48-10 at 5).

The next morning, on December 2, 2020, another employee observed Plaintiff "taking down her pictures" from her office around 5:00 a.m.  According to an email the employee sent the next day describing the encounter, which Plaintiff referred to as "beautifully accurate," the employee commented to Plaintiff that it looked like she was "clearing out," and she responded, "I can't say anything about it.  I will only say that Josh and I are not on the same page."  (ECF Nos. 43-9, 43-10 at 43).

At 6:19 a.m. that same morning, Plaintiff sent an email to Mr. Rice, with Mr. Martin and Ms. Schuerholz copied on the email. (ECF No. 43-10).  Plaintiff began the email by stating that she "wanted to add a few things" following the previous day's meeting. She went on to say,

> I am unsure that waiting until February will change my final employment outcome at [OCL] based on the fact that you were fully prepared

> to terminate my employment yesterday at that
> meeting.  I also feel that you were slightly
> hostile at that meeting because of your body
> language; your arms were crossed and your tone
> of voice was harsh.
>
> I must state that I feel this entire ordeal is
> an act of retaliation because I would not
> assist you in bringing undeserved employee
> relations troubles to Bob Nash as well as the
> fact that just barely 2 weeks ago, I
> approached you in your office and explained
> how I believed your words and actions towards
> me were Racist and Sexist.  I was willing to
> accept your unfounded response, simply because
> I wanted to believe something other than what
> I was experiencing.  I like working at [OCL].

She then described that when she previously worked with Defendant, she was never told that Defendant had problems with her writing, and she "never encountered the treatment and . . . behavior that [she had] encountered . . . at [the] Baltimore office."  She added that Mr. Rice had praised her for her writing abilities around the time she was hired.  She continued,

> Yet you insinuate that I am unable to read and
> comprehend.  Stating that I am unable to
> decipher relevant information from that which
> is not relevant in what I am reading.  You
> even went as far as to intimate that I cannot
> even craft a decent paragraph.
>
> Since the inception of my employment you've
> been standoffish with me.  In the beginning I
> thought it was because you simply did not know
> me.  Now I feel it is based on your Racist and
> Sexist mindset.

She then described the incident wherein she believed Mr. Erdman, who was a "close family friend" of Mr. Rice, fabricated a

story about having a close friendship with a Black couple.  She
described this as "quintessential Racism," which left her "with a
full understanding of the fact that neither [Mr. Rice] nor [Mr.
Erdman] have any type of intimate acquaintance with any Black
people."  She also cited having been instructed to seek out
billable work and having been told she could not return to work
without a negative COVID-19 test result.  She concluded the email,

> With this email, once again, I am attempting
> to reach out to you and find a solution to
> what I believe is a fundamental problem with
> my continued employment with [OCL]; at least
> at the Baltimore office however, due to the
> circumstances described herein, I believe that
> I am being constructively terminated and I
> believe this to be based solely on my Race and
> Gender.
>
> Please provide some guidance as I do not know
> what else to do.

At 9:27 a.m., Ms. Schuerholz responded to Plaintiff's email,
instructing her to "come to the Olney office at 2:30 p.m."  (ECF
No. 48-20).  It was then communicated that Ms. Schuerholz and Mr.
Martin would travel to the Baltimore office to meet with Plaintiff.
Meanwhile, Plaintiff sent an email to Mr. Rice at 10:47 a.m.
regarding a project and attached a draft on which she had worked,
ostensibly unrelated to the ongoing issues.  (ECF No. 48-22 at 1).
Plaintiff sent another email at 11:17 a.m. to Mr. Rice and Mr.
Erdman that said, "I am available to receive further assignment
whenever you are ready," and Mr. Rice responded to that email at

11:29 a.m. with instructions about another assignment.  (ECF No. 48-22 at 4).

Plaintiff met with Ms. Schuerholz and Mr. Martin that afternoon.  Ms. Schuerholz's notes from the meeting reflect that they met at approximately 3:15 p.m. that day, and the notes begin by stating that Mr. Martin "explained to [Plaintiff] that [they] were terminating her effective" immediately.  (ECF No. 43-11).  The notes do not reflect that a reason for the termination was discussed.  According to the notes, Plaintiff was handed a typed termination letter at the meeting, which did not contain a reason for the termination.  (ECF No. 48-21).

On the evening of December 3, 2020, Mr. Martin sent an email in response to Plaintiff's email from the previous day.  (ECF No. 43-10 at 1).  He began the email by stating that he had been "surprised" by her email because he was told that the December 1 meeting "went well and was very constructive."  He then noted that "subsequent to [her] termination," he had been "informed . . . that [she] had already cleaned out [her] office prior to sending [her] email," which he found "odd, considering the final statement in [her] email where [she sought] guidance from Josh."  He went on to say,

> You mention constructive termination, based
> solely on your race and gender.  However, let
> me be clear: you were terminated, within your
> introductory period, based upon your
> performance of the work that was required of

> you. . . . You never informed [OCL] of any
> race and/or gender issues you experienced with
> Josh or Rusty (or anyone else at [OCL]) until
> your email below[.] . . . Nonetheless, upon
> receipt of your email we immediately contacted
> employees involved in your allegations.  We
> found no merit in your accusations.

Plaintiff filed a Charge of Discrimination with the EEOC on February 12, 2021, and the EEOC issued a Notice of Right to Sue on August 13, 2021.  Plaintiff, acting *pro se*, filed a complaint with this court on September 28, 2021, alleging violations of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, et seq., and the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code, State Gov't § 20-601, et seq.  (ECF No. 1).  Defendant filed an answer. (ECF No. 8).  The parties engaged in discovery, and Defendant filed a motion for summary judgment on all claims on July 6, 2022.  (ECF No. 43).  Plaintiff filed a response, and Defendant filed a reply. (ECF Nos. 48, 52).

## II.  Standard of Review

A court may grant summary judgment if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  A genuine dispute about a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

12

The nonmoving party must come forward with more than a "mere scintilla of proof" to withstand summary judgment. *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted). However, the court must "view the evidence in the light most favorable to . . . the nonmovant[] and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). When the nonmoving party is acting *pro se*, the court should construe her pleadings liberally, but she "must still set forth facts sufficient to withstand summary judgment." *Symeonidis v. Paxton Cap. Grp., Inc.*, 220 F.Supp.2d 478, 480 n.4 (D.Md. 2002).

## III. Analysis[5]

### A. Hostile Work Environment Claims

Plaintiff describes several incidents of "hostile, bias[ed,] and disparate treatment based upon her race and gender," which

---

[5] This analysis section discusses Plaintiff's hostile work environment, discriminatory termination, and retaliation claims using Title VII case law, but because claims brought under the MFEPA are analyzed under the same legal frameworks as claims brought under Title VII, the analysis will apply to Plaintiff's MFEPA claims as well. *See Payne v. Medstar Health, Inc.*, No. 21-cv-2841-RDB, 2022 WL 17584375, at *5 (D.Md. Dec. 12, 2022) (citing cases); *see also Dobkin v. Univ. of Baltimore Sch. of Law*, 210 Md.App. 580, 592-93 (Md. 2013) (citing cases).

occurred prior to her termination.   (ECF No. 48 at 13).   It is unclear whether she intends to raise separate discrimination or hostile environment Title VII and MFEPA claims based on those incidents or whether she merely included them for background information for her termination and retaliation claims.

To the extent she intended to raise disparate treatment claims based on any or all of those pre-termination incidents, Defendant is entitled to summary judgment on those claims.   To succeed on a disparate treatment claim, either through direct or indirect evidence of discrimination, a plaintiff must show that she suffered an "adverse employment action."   *See James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004); *see also Hoffman v. Balt. Police Dep't*, 379 F.Supp.2d 778, 792 (D.Md. 2005).   For an action to constitute an adverse employment action, it must "adversely affect[] the terms, conditions, or benefits of the plaintiff's employment."   *James*, 368 F.3d at 375 (internal quotation marks omitted).   Generally, adverse employment actions are found in cases of "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion."   *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999); *see also James*, 368 F.3d at 376.   "Title VII does not remedy everything that makes an employee unhappy." *Jeffers v. Thompson*, 264 F.Supp.2d 314, 329 (D.Md. 2003).

The facts as Plaintiff describes them, viewed in the light most favorable to her, may lead a jury to conclude that Plaintiff experienced differential treatment by her supervisor and co-workers. However, being left out of lunch orders, being asked to travel further to retrieve office supplies, and the other incidents Plaintiff describes do not rise to the level of adverse employment actions.

Discriminatory incidents that do not by themselves constitute adverse employment actions may nevertheless rise to the level of a Title VII violation if "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)). However, to the extent Plaintiff's complaint can be read to rely on a hostile work environment theory, it fails to allege facts that are actionable under Title VII. It is well established that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. Cty. of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citations omitted). The incidents Plaintiff describes, including comments by co-workers about her hair being

"neat" and about her attendance at a Historically Black College, may or may not have been racially charged, but they do not rise to the level of "severe," "pervasive," or "extremely serious" to support a viable hostile work environment claim. Accordingly, Defendant is entitled to summary judgment on Plaintiff's claims, to the extent she raises any, based solely on the pre-termination incidents.

**B. Discriminatory Termination Claims**

Plaintiff argues that her termination was an act of gender and race discrimination. (ECF No. 48 at 16). In order to prevail on this claim, Plaintiff must prove that she was discharged because of her race and/or gender, either through direct evidence of discriminatory intent or through circumstantial evidence of discrimination under the burden shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Plaintiff seeks to prove her claim through the latter method. (ECF No. 48 at 18-28).

Under the *McDonnell Douglas* framework, a plaintiff must first make a prima facie showing that: (1) she is a member of a protected class; (2) she was satisfactorily performing her job at the time of the termination; (3) she was terminated from her employment; and (4) she was discharged under circumstances that give rise to an inference of discrimination, such as where the misconduct that resulted in her termination was comparable in seriousness to

16

misconduct of other employees outside the protected class who were not discharged, or where a similarly qualified person outside the protected class was chosen to fill the vacated position. *See Stewart v. Morgan State Univ.*, 46 F.Supp.3d 590, 598 (D.Md. 2014), *aff'd*, 606 F.App'x 48 (4th Cir. 2015); *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019); *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003).

It is undisputed that Plaintiff is a member of a protected class and that she was terminated from her employment. Defendant argues that Plaintiff cannot demonstrate that she was satisfactorily performing her job at the time of the termination. (ECF No. 43-3 at 19). The "satisfactory performance" element of the prima facie case "does not require the plaintiff to show that [s]he was a perfect or model employee" but rather simply "that [s]he was qualified for the job and that [s]he was meeting [her] employer's legitimate expectations." *Haynes*, 922 F.3d at 225. Additionally, poor performance reviews may not be enough to stymie a plaintiff's prima facie case if they came from the same individuals that the plaintiff has accused of discrimination. *See London v. Loyola High Sch. of Balt., Inc.*, No. 17-cv-2219-DKC, 2019 WL 4673436, at *4 (D.Md. Sept. 25, 2019), *aff'd*, 806 F.App'x 255 (4th Cir. 2020).

Here, the record reflects that Plaintiff's supervisors had expressed concerns about her writing abilities prior to her

termination.  However, the record also shows that her supervisors decided the day before her termination to continue working with Plaintiff on her writing skills and extend her probationary period by 60 days.  Defendant does not contend that Plaintiff's writing abilities worsened in the 24 hours between the meeting on December 1, 2020, and Plaintiff's termination.  Therefore, a reasonable jury could conclude on this record that, while Plaintiff may not have been a perfect employee at the time of her termination, she was meeting her employer's expectations such that OCL was willing to continue employing her for at least 60 more days.

Defendant also argues that Plaintiff has not produced evidence that she was discharged under circumstances that would give rise to an inference of discrimination.  In her response to Defendant's motion, Plaintiff points to two instances of differential treatment in support of her prima facie case.  (ECF No. 48 at 27-28).  First, she argues that she was allegedly terminated in part because of the quality of her writing in the I-20 Project report, while Mr. Erdman, a Caucasian man who also worked on the report, was not punished for his part in it.  Second, she argues that a Caucasian woman, Grace Kolberg, who worked for Defendant at the same time as Plaintiff, was chosen to fill Plaintiff's position after Plaintiff was terminated.  Plaintiff has not cited any evidence in the record to support either of those assertions.  Defendant attached an affidavit to its reply in which

18

Mr. Martin attested that (1) "Ms. Johnson was not replaced by Grace Kolberg," but he does not say who, if anyone, replaced her; and (2) "Rusty Erdman was reprimanded by Dr. O'Connell for his work on the I-20 report, and he was instructed to complete a technical writing course, which he did." (ECF No. 52-2 at 1). Generally, "unsubstantiated factual contentions found in the summary judgment briefs are simply not enough to stave off summary judgment." *Smith v. Vilsack*, 832 F.Supp.2d 573, 580 (D.Md. 2011). The court construes Plaintiff's submissions liberally, given her *pro se* status, but even so, Plaintiff would likely lack first-hand knowledge to be competent to testify about who replaced her and how another employee was disciplined.

However, the burden of establishing a prima facie case of disparate treatment is not meant to be onerous. *See Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). Plaintiff has also asserted that, as the only non-Caucasian employee in the office, she was treated differently from other employees on many occasions throughout her short employment there. While those instances of differential treatment may not have been severe or pervasive enough to support a hostile work environment claim, when viewed in the light most favorable to Plaintiff, they tend to support an inference that the circumstances under which Plaintiff was discharged involved discrimination based on race. There is,

on the other hand, no evidence on which to infer that gender discrimination was involved in her termination.

This is especially so, given the relatively strong evidence that Defendant's proffered reason for Plaintiff's termination was pretextual.  Defendant proffers that Plaintiff was terminated because (1) she was "not performing at the level that OCL expected," "primarily due to her deficient writing skills," and (2) "she was also unwilling to take any steps to improve her performance," as evidenced by Plaintiff's clearing out her office and sending the email "expressing that the December 1, 2020 action plan was unlikely to make any difference and demonstrating her resistance to the constructive criticism she had received at the meeting."  (ECF No. 43-3 at 25-26).

As previously discussed, it defies reason to suggest that Defendant terminated Plaintiff because of her deficient writing skills when Plaintiff's supervisors had made a plan to work with Plaintiff to improve her writing and extended her employment by 60 days just 24 hours before her termination.  Defendant points to Plaintiff's clearing out her office as suggestive that she was unwilling to take steps to improve her performance.  However, in Mr. Martin's email to Plaintiff the day after her termination, he stated that he did not learn that Plaintiff "cleared out her office" until *after* he and Ms. Schuerholz terminated Plaintiff's employment.  (ECF No. 43-10).

As for Plaintiff's email reflecting her unwillingness to take steps to improve her performance, a reasonable reading of Plaintiff's email supports a contrary conclusion. While Plaintiff stated that she felt like she was "being constructively terminated" and that she was "unsure that waiting until February [would] change [her] final employment outcome," she also stated things like, "I like working at [OCL]," "I am attempting to reach out to you and find a solution to what I believe is a fundamental problem with my continued employment with [OCL]," and "Please provide some guidance as I do not know what else to do." This language could be read as Plaintiff expressing her fear that she may eventually have to leave the company one way or another while also expressing her desire to avoid that outcome. Indeed, Mr. Martin recognized in his email that he found Plaintiff's cleaning out her office to be "odd, considering the final statement in [her] email where [she sought] guidance from Josh." (ECF No. 43-10). In addition, Plaintiff apparently continued working as usual on the morning of December 2, 2020, prior to her termination, with Mr. Rice continuing to assign her tasks, which suggests that she was *not* proceeding as if she had already been constructively terminated. (*See* ECF No. 48-22).

Plaintiff has come forward with sufficient evidence to support a jury conclusion that Defendant's proffered reason for terminating her was pretextual. While her prima facie case is not

particularly strong, there is enough evidence in the record supporting an inference of discrimination based on race, such that the "better course would be to proceed to a full trial" on Plaintiff's discriminatory termination claim.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Summary judgment will be granted as to discriminatory termination based on gender.

### C. Retaliation Claims

Plaintiff also claims that she was discharged in retaliation for having complained of race and gender discrimination.  To establish a prima facie case of retaliation, a plaintiff must demonstrate "(1) that [s]he engaged in protected activity, (2) that the employer took a materially adverse action against h[er] and (3) there is a causal connection between the protected activity and the adverse action." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019).  "[P]rotected activit[ies]" include "participation" in a formal investigation or proceeding regarding alleged violations of Title VII as well as informal "opposition" to discrimination in the workplace.  *Id.; see also EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005).  Specifically, "oppositional conduct" can include "voicing one's opinions in order to bring attention to an employer's discriminatory activities." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015) (quoting *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998)).  Once a prima facie case is

established, the burden shifts to the defendant to articulate a legitimate, non-retaliatory justification for the adverse employment action, and if the defendant does so, the burden shifts back to the plaintiff to demonstrate that the reason is pretextual. *Navy Fed. Credit Union*, 424 F.3d at 405.

Here, Plaintiff argues that she engaged in two protected activities: (1) her oral complaint to Mr. Rice on November 20, 2020, where she told him he needed "sensitivity training and that [he] obviously ha[d]n't worked around enough women—especially black women like [her]—in [his] career," (ECF No. 43-14); and (2) her written complaint in her December 2, 2020, email to Mr. Rice in which she stated that she believed Mr. Rice had a "Racist and Sexist mindset" and that she was "being constructively terminated . . . based solely on [her] Race and Gender," (ECF No. 43-10).

When asked in her deposition what led her to make the first complaint, she said that it was a "culmination of things," including Mr. Rice's refusal to assign her billable work, Mr. Rice's refusal to give Plaintiff the company credit card to purchase office supplies, Mr. Rice's refusal to give her "any say so in anything," and his comment that Plaintiff "did not have the ability to comprehend what [she] was reading." (ECF No. 48-10 at 10-25). Her second complaint appears to have been based on Mr. Rice's threats to terminate her employment, his "slightly hostile" body language and tone at the December 1, 2020, meeting, his

23

criticisms of her writing abilities—including that she "could not write a sentence, much less a paragraph"—and his general treatment of her throughout her employment at OCL, including some of the aforementioned actions.  (ECF No. 43-10).

Defendant argues that Plaintiff did not engage in protected activity.  (ECF No. 43-3 at 28).  Specifically, Defendant argues that Plaintiff cannot show that the actions she complained of as discrimination could reasonably and in good faith be regarded as violative of Title VII.  Defendant cites *Sanders v. Tikras Tech. Sols. Corp.*, 725 F.App'x 228, 230 (4th Cir. 2018), where the court affirmed a district court's grant of summary judgment in favor of the defendant on a Title VII retaliation claim because there was "no evidence that connect[ed] any untoward behavior or comments with any form of racial or gender discrimination," such that the plaintiff's "subjective belief that her supervisor was acting with discriminatory intent was not objectively reasonable."

In *Sanders*, the district court had found that the plaintiff "presented no evidence to support her opinion" that another employee "had a problem with her being a black woman in a managerial position," either at the time she voiced that opinion to her supervisor or before the trial court.  *Sanders v. Tikras Tech. Sols. Corp.*, No. 1:16-CV-00985, 2017 WL 3123660, at *3 (E.D.Va. July 21, 2017).  In another case Defendant cites, *Adams v. Giant Food, Inc.*, 225 F.Supp.2d 600, 605-06 (D.Md. Sept. 30,

2002), the district court found that the plaintiffs had failed to make out a prima facie case of retaliation because the only complaints they made prior to their terminations were of "favoritism towards a few specific employees" and of "general favoritism towards female[]" employees, whereas the complaint was of retaliation based on complaints of racial discrimination.

Compared to those cases, there is more evidence here of conduct that could reasonably lead Plaintiff to believe that Mr. Rice was treating her differently because of her race and/or gender.  Plaintiff was the only Black woman (and the only non-Caucasian person) in the office, and she observed that Mr. Rice treated other employees more favorably, even if only in small ways, on multiple occasions during her brief employment at OCL.  She also believed that Mr. Rice made unwarranted assumptions and exaggerated criticisms about her writing and comprehension abilities.  On their face, the actions Plaintiff cites do not appear to be related to race or gender, but disparate treatment and harassment "need not be accompanied by a contemporaneous statement of animus to be actionable under Title VII—rather, the connection between animus and conduct may be inferred from the totality of the circumstances." *Strothers v. Cty. of Laurel, Md.*, 895 F.3d 317, 330-31 (4th Cir. 2018) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)).

The fact that a hostile work environment claim based on the pre-termination incidents could not survive summary judgment does not mean that Plaintiff was unprotected from retaliation for complaining about those incidents.  Plaintiff is not required to prove that the actions she complained of actually violated Title VII for the purposes of her retaliation claim—only that she *reasonably believed* that the actions violated Title VII.  In the case of isolated incidents that, even taken together, were insufficient to make up a "hostile work environment," it is enough for the purposes of her retaliation claim for Plaintiff to show that she reasonably believed that a hostile work environment was developing, based on repeated incidents of differential treatment occurring throughout her brief period of employment.  *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 284 (4th Cir. 2015) ("[A]n employee is protected from retaliation when she opposes a hostile work environment that, although not fully formed, is in progress"); see also U.S. Equal Emp. Opportunity Comm'n, EEOC-CVG-2016-1, Enforcement Guidance on Retaliation and Related Issues, II(A)(2)(c) (2016) (instructing that "it is protected opposition if the employee complains about offensive conduct that, if repeated often enough, would result in an actionable hostile work environment").[6]  Viewing the disputed facts in the light most

---

[6] In *Boyer-Liberto*, the court concluded that an employee has a sufficiently "reasonable belief that a hostile environment is

favorable to Plaintiff, and without weighing the evidence or making credibility determinations, the court concludes that a rational jury could find that Plaintiff reasonably believed she had been unlawfully discriminated against when she made one or both complaints.[7]

Defendant does not dispute that it took a materially adverse action against Plaintiff when it terminated her, nor does it dispute that a causal connection could be inferred between the protected activity and the adverse action. Indeed, the temporal proximity between Plaintiff's second complaint and her termination was "very close"—only a few hours—which can alone be sufficient evidence of causality to establish a prima facie case. *See Clark*

---

occurring" if she experiences an isolated incident that, while not severe, was "physically threatening or humiliating," but left open the question of whether a sufficiently reasonable belief that a hostile environment is occurring could be based on merely offensive conduct "that, if repeated, could amount to a hostile work environment." *See Boyer-Liberto*, 786 F.3d at 284, n.6. However, the EEOC has "long disagreed with cases that find no protection from retaliation for employees complaining of harassment because it is not yet 'severe or pervasive' or could not be reasonably viewed as such," and it has expressed its position that "[i]t is reasonable for an employee to believe conduct violates the EEO laws if the Commission, as the primary agency charged with enforcement, has adopted that interpretation." U.S. Equal Emp. Opportunity Comm'n, EEOC-CVG-2016-1, Enforcement Guidance on Retaliation and Related Issues, II(A)(2)(c) (2016).

[7] Notwithstanding the grant of summary judgment as to the discriminatory termination claim based on gender but denial of summary judgment as to the discriminatory termination claim based on race, the court finds it unnecessary at this stage to parse the retaliation claim in this way.

*Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).  And, as previously discussed, Plaintiff has produced sufficient evidence that Defendant's proffered reason for her termination was pretextual.  Accordingly, Defendant's motion for summary judgment will be denied as to Plaintiff's retaliation claims as well.

## IV. Motions for Leave of Court

Plaintiff has filed two motions "for leave of court."  (ECF Nos. 50, 53).  In the first, she requests "leave of the Court to file Exhibit 16" to her response to Defendant's motion, citing the "Stipulated Order Regarding Confidential Materials."  (ECF No. 50).  That exhibit is marked confidential but is currently not filed under seal.  (ECF No. 48-16).  According to the parties' Stipulated Order Regarding Confidential Materials, the parties agreed to file any materials marked confidential under seal with an accompanying interim sealing motion.  (ECF No. 16 at 5).  In light of Plaintiff's citation to that agreement, Plaintiff's first motion will be construed as a motion to seal.  However, she has not provided any reasons as to why the document should remain under seal, nor has Defendant, as required by Local Rule 105.11.  Accordingly, the motion to seal will be denied, and the document will remain unsealed.[8]

---

[8] As part of her first motion, Plaintiff also "ask[s] this court to consider Civil Procedure Rule 12(h)" with regard to an inaccuracy in Mr. Martin's affidavit—he stated that Plaintiff submitted the I-20 Project Report in November 2020, but Plaintiff

In her second motion, Plaintiff requests "leave of the Court to file part of Exhibit 23" to her response. (ECF No. 53). This court construed that motion as a motion to seal, and that exhibit was sealed temporarily. (ECF Nos. 55, 57). Plaintiff was instructed to supplement her motion with reasons to justify the sealing. (ECF No. 55). Plaintiff filed a response, stating that she does not have any reasons to justify the sealing of the document, as it was Defendant who labeled the document as confidential. (ECF No. 57). Defendant has not provided any reasons to justify the sealing. Accordingly, the motion to seal will be denied, and that document will be unsealed.

## V. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment will be granted as to Plaintiff's Title VII and MFEPA pre-termination discrimination and hostile work environment claims, as well as to Plaintiff's claim for discriminatory termination based on gender, and it will be denied as to Plaintiff's Title VII and MFEPA discriminatory termination claim (based on race) and retaliation claim. Plaintiff's motions for

---

asserts that she submitted it on October 15, 2020. (ECF No. 43-5). Defendant has admitted that this was a typographical error, and Mr. Martin has clarified that the report was submitted in October in his supplemental affidavit, attached to Defendant's reply. (ECF Nos. 54, 52-2). It is unclear what action Plaintiff wishes the court to take under Rule 12. To the extent she wishes the court to recognize the inaccuracy in the affidavit filed by Defendant, it has been taken into consideration.

leave of court, construed as motions to seal, will be denied.  A separate order will follow.

/s/
_____
DEBORAH K. CHASANOW
United States District Judge
